JOHN B. DYER *et al.*, Appellants, *v.* JOHN BRANNOCK *et al.*,. Respondents.

### June 10, 1876.

1. A sued several defendants jointly in ejectment, setting up separate hold-- ings. He was ordered to elect against whom he would proceed, and did so, dismissing as to the others, and saving no exceptions to the order. Afterwards he became a nonsuit on another matter, which was set aside by the court in general term. *Held*, that, upon the cause being remanded to special term for trial, it was not competent for A to proceed against. those defendants as to whom he had dismissed before becoming nonsuit..

2. A cohabited with B, and a child, C, was born of this intercourse. He sub- sequently married D, to whom a child was born, who survived D, but died in infancy. Afterwards A resumed his intercourse with B, living with her until his death, acknowledging the child, C, as his, but no marriage cere- mony of any kind took place between them at any time. D died seized of real estate, and the descendants of C claimed it as the heirs of A, alleging that A inherited it from his deceased child by D. *Held*, 1. That C was a bastard child of A. 2. That nothing was done which legitimized C. 3. That the descendants of C could not claim title as the heirs of A.

3. If a right of action to recover real estate accrued to a person under disa- bility after February 2, 1847, then such person's right of action is forever barred, if suit be forborne for twenty-four years, notwithstanding such disability.

4. If such disability continue for ten years or more, but less than twenty-four years, during which time suit is forborne, and, upon the removal of the disability, three years in addition elapse without suit, the bar is complete..

5. It is error to instruct a jury as to the effect of adverse possession without. also instructing them as to what constitutes adverse possession.

APPEAL from St. Louis Circuit Court.
*Affirmed.*

*Pope & Randall*, for appellants, cited :  Wag. Stat. 531, sec. 11 ;  Linceum *v.* Linceum, 3 Mo. 441 ;  Stones *v.* Keel-

ing, 5 Cal. 145; Sleigh v. Strider, *Ib.* 439; Rice v. Efford, 3 Hen. & M. 224; Johnson v. Johnson, 30 Mo. 72; Buchanan v. Harvey *et al.*, 35 Mo. 281; Graham v. Bennett, 2 Cal. 503; 1 Ter. Laws of Mo. 66, sec. 3; Holabird v. Atlantic Mutual Life Ins. Co., Am. Law Reg. Sept. 1873, 566; 1 Bishop's Mar. & Div., secs. 3, 229, 269, 272, 277, 283; Schouler's Dom. Rel. 40, 41; 2 Kent's Com. (12th ed.) 87; 2 Greenl. on Ev. sec. 460; Fenton v. Reed, 4 Johns. 52; Clayton v. Wardell, 4 N. Y. 230; Londonderry v. Chester, 2 N. H. 279; Chiseldine's Lessee v. Brewer, 1 Har. & McH. 152; Canjolle v. Ferris, 26 Barb. 177; Van Tuyl v. Van Tuyl, 57 Barb. 235; Carmichael v. The State, 12 Ohio, 553; The State v. Fry *et al.*, 4 Mo. 120; Keer v. Barnes, 29 Mo. 377; Jackson v. Hazen, 3 Johns. 441; Fosgate v. Herkimer Mnfg. Co., 2 Kern. 580; Vorhie's Pr. 598; Keene v. Baine, 29 Mo. 377; 2 Sellon K. B. 178, 196, 229; Rem. on Eject. 59, 187, 188; Barnes, 176; Buller N. P. 98; Jackson *ex dem.* Haines v. Woods *et al.*, 5 Johns. 278; Grimstone v. Bourgess *et al.*, Barnes, 176, 196; Jackson v. Andrews, 7 Wend. 158; Pickering's Lessee *et al.*, 12 Serg. & R. 435; Cambden *et al.* v. Haskill, 3 Ran. 462; Adams on Eject. 262, 291; Tyler on Eject. and Adv. Poss. 625, 637, 642, 644, 649; Hickman v. Boyd, 1 Mo. 495; Jones v. Snedecor, 3 Mo. 390; Pratt v. Rogers, 5 Mo. 51; Downing v. Boweleier, 21 Mo. 149.

*Cline, Jamison & Day*, for respondents, cited: Richards v. Brehem, 73 Penn.; Russell v. Bissell, 55 Barb. 325; Guardians of the Poor v. Nathans, 2 Brew. 149; Lenscum v. Lenscum, 3 Mo. 441; Wag. Stat. 916, sec. 4; Smith v. Bartis, 9 Johns. 181; Demarest v. Wynkoop, 3 Johns. Ch. 129, 133; Doe v. Jesson, 3 East, 309; Bush v. Bradley, 4 Day, 298; Bunce v. Wolcot, 2 Conn. 27; Doe v. Jones, 47 T. R. 200; Stowell v. Zoak, Plowd. 353.

GANTT, P. J., delivered the opinion of the court.

This was an ejectment, commenced on August 11, 1872, to recover possession of part of survey 3,182, of a con-

28

firmation by the act of 1836, to the representatives of
Motard, lying in the *cul-de-sac* of the Grand Prairie common
field.   Upwards of 100 persons occupied different parts of
this land.   They were all sued together as joint trespassers.
They answered separately, denying the title of plaintiff, and
also denying any joint occupation.   Each set up his several
holding.   The statute of limitations was also set up in each
case.   Some alleged a possession of twenty-four years,
others thirty-six.   Plaintiffs demurred to some of these
answers, and moved to strike out others of them.   The court
overruled both motions and demurrers.   The case came on
for trial in February, 1873.   The court ordered the plaintiffs
to elect against which of the defendants they would proceed,
and to dismiss the suit as to all the other defendants.
Whereupon plaintiff elected to proceed against Brannock,
and dismissed as to the other defendants.   At a later period
of the trial plaintiff became non-suit, with leave etc., and the
general term set this non-suit aside.   The cause came on to
be tried again in November, 1874, when there was judgment
for defendant Brannock, which was affirmed in general term,
and the case comes before us by appeal.   When the cause
was tried in November, 1874, plaintiffs claimed, notwith-
standing their dismissal of the suit as to all but Brannock, to
be entitled, by virtue of the reversal of the ruling by which
they had been driven to a non-suit, to proceed against all
the original defendants.   The court refused to allow this,
and plaintiff excepted.   At the trial evidence was given of
a confirmation to Motard's representatives of a tract of land
in the *cul-de-sac* of the Grand Prairie, and that James Daud
and Sally Adams were such representatives as to a portion
of this tract.   Sally Adams was, in November, 1824, mar-
ried to Zachariah Wilson.   She died in child-bed, in 1826,
leaving a child, who died in 1827.

Zachariah Wilson was a river-pilot.   On August 24, 1819,
he agreed with Jane Collins that they would thereafter live
together as man and wife.   This agreement they communi-

cated to the mother and brother of Jane, and to some boarders in the family, and, about ten o'clock, P. M., Jane and Zachariah retired to an apartment prepared for them. They cohabited until September 13, 1819, when Wilson left her and accompanied Major Long on his celebrated expedition westward. She appears to have seen no more of him until 1830. At that time she was living in St. Charles with her daughter, Cynthia Elizabeth, the fruit of her connection with Wilson. This child, she tells us, was born on April 28, 1820. Wilson wrote to her that if she would come to St. Louis and live with him again he would take care of her and her child, which he acknowledged to be his also. She consented to this, and thereafter lived with him until his death, in 1836. Cynthia lived with them, and Wilson acknowledged her as his daughter. Shortly after Wilson's death, Cynthia married Abner Dyer, and the plaintiffs are the children of that marriage. Cynthia died in July, 1869; Abner in June, 1870. After Wilson had gone away, Jane Collins heard from others that he had left a wife and children in his native State. He was about twenty-seven years old in 1819; she was about nineteen. From first to last no marriage ceremony took place between Jane Collins and Zachariah Wilson. The nearest approach to it was their standing up in the parlor of her mother's boarding-house, in St. Louis, on August 20, 1819, joining hands, and assenting by bowing their heads, in the presence of several witnesses, to the statement that they were going to live together through life, and then retiring. All these facts appear by the testimony of Jane Collins, or Jane Wilson, who testified at the trial as a witness for plaintiff, and who seems to have told the truth with great candor.

After the death of Wilson, a proceeding in partition was commenced, in which the tract of land sued for was set off and allotted to the " unknown heirs of Zachariah Wilson."

There was evidence tending to show that defendant, and those under whom he held, had been in possession of the

land, with claim of title from 1844 to the commencement of this suit, claiming it as their own.

The court charged the jury as follows :

"You are instructed that the premises sued for are part of a tract of land confirmed to the representatives of Joseph Motard by the act of Congress of July 4, 1836, and that the title to the premises was vested in Sarah Ann Adams at the time of her death. The plaintiffs seek to recover as the alleged descendants of Zachariah Wilson, to whose heirs, then unknown, the portion of the Motard tract which included these premises was set apart by the decree of the St. Louis Circuit Court rendered in 1838. Whether the plaintiffs can recover as the descendants of Zachariah Wilson will depend upon their having established (1) that they are such descendants, and (2) that Wilson himself, having title to the premises sued for at the time of his death, transmitted such title, by descent, to the plaintiff.

"If you believe from the evidence that one Cynthia Elizabeth Wilson was the daughter of Zachariah Wilson, that said Cynthia Elizabeth married one Abner W. Dyer, and that plaintiffs were born of such marriage, then you will find that plaintiffs are the descendants and heirs of Zachariah Wilson. If you believe from the evidence that Wilson was married to Sarah Ann Adams in the year 1824, that a child was born of such marriage, that Sarah Ann died leaving such child surviving her, and that Wilson survived said child, then, upon the death of such child, the title to the premises in controversy became vested in Zachariah Wilson ; and if you further find from the evidence that, in the year 1819, at the town of St. Louis, intending thereby to contract marriage, the said Wilson and one Jane Collins mentioned [sic] agreed to live together thenceforward as man and wife, and that of the union thus formed Cynthia Elizabeth Wilson was born, and that she survived the said Wilson, then the title to the premises sued for became vested in said Cynthia, and, at her death, descended to the plaintiffs.

as her heirs. But if you believe from the evidence that when they came together, in 1819, that said Wilson and the said Jane Collins did not intend to contract marriage, but to merely live together for purpose of illicit cohabitation, and that of such intercourse the said Cynthia was born, then, upon the death of her father, she did not become vested with the title to the premises sued for—unless you find from the evidence that, subsequently to the birth of said Cynthia, and after the death of Sarah Ann Adams, the said Wilson and the said Jane Collins, intending thereby to intermarry, mutually agreed to live together thenceforward as man and wife, and did so live, and that, after such reunion, the said Wilson recognized the said Cynthia as his child. If the conditions of the legitimacy of said Cynthia thus indicated have, in your opinion, been satisfied by the evidence, and you believe that the plaintiffs are descendants of said Wilson, then the deeds, documents, and records read in evidence by the plaintiffs complete the legal title in these plaintiffs to the premises sued for, and they are entitled to recover, unless the defendant has established his defense under the statute of limitations. Upon this branch of the case you are instructed that a party who acquires title to land under the statute, by continuous possession adverse to the true owner, acquires all the title of such owner precisely as if the possessor had received a deed from such owner. But, in order to give title under the statute, the possession must have been had during the period limited by statute which has elapsed since a right of action accrued to the real owner, and must have been adverse, open, notorious, continuous, and under a claim of title. And you are instructed, further, that the statute begins to run in favor of one in possession of real estate, as against the true owner, only from the time when such possession becomes adverse to such owner, and that, when such owner is a married woman, and she acquires a right of action during coverture, the statute does not begin to run against her until after the disability

of coverture has ceased, and that she, and those claiming under her, have three years after the termination of such disability within which to sue for possession, unless the occupant has been in possession openly, notoriously, continuously, and adversely for the term of twenty-four years next before the commencement of such suit. Hence, if you believe from the evidence that at the time when, either in person or through their tenants, the defendant, or those under whom he holds, entered into possession of the premises sued for, Cynthia E. Dyer was a married woman; that she remained a married woman until her death; that within three years after such death this suit was brought and that the defendant, and those under whom he holds, had been in possession of the premises sued for during a period less than twenty-four years next before this suit, then the plaintiffs are entitled to recover, and you will return a verdict accordingly. But, on the other hand, if you believe from the evidence that, at the time when this suit was brought, more than three years had elapsed from the death of said Cynthia, and that the defendant, and those under whom he holds, either through themselves or by their tenants, had been in possession of the premises sued for during a period of ten years or more next before such suit; that such possession was adverse to all others, open, notorious, continuous, and under claim of title, then the plaintiffs cannot recover, and you will find for defendant.

"For the purpose of determining whether there has been a claim of title on the part of the defendant, and those under whom he holds, you may have reference to the deeds read in evidence on his part; but such deeds are evidence before you for no other purpose. If you believe from the evidence that, under such claim of title, the parties under whom defendant holds, either by themselves or by their tenants, took possession of a portion of the tract, of which the premises sued for formed a part, asserting title to the whole tract, and exercising acts of ownership over such

tracts, either by maintaining fences upon or paying taxes upon the same, then the actual possession of such part was possession of the whole for the purpose of the defense. And you are instructed, further, that, if you find that the possession of the defendant, and those under whom he claims, was adverse, open, notorious, and continuous, as before indicated, then the bar of the statute will prevent a recovery, even if the plaintiffs, and those under whom they claim, had no actual knowledge of such occupancy by the defendant, and those under whom he claims title. If you find for the plaintiffs, you will find that they are entitled to the possession of lots 10, 11, 12, and 13, of block 1, of Darby's addition to the city of St: Louis—these lots being the only part of the tract sued for of which defendant has been shown to be in possession. And you will, if you so find for plaintiffs, assess their damages at the sum of one cent, and find the value of the monthly rents and profits to be nothing.''

The counsel for plaintiff excepted to this declaration of the law applicable to the facts in evidence, and asked a number of instructions, all of which the court refused, against their exceptions. All of those which relate to the possession of the property and the operation of the statute of limitations we omit. The case does not, in our opinion, turn upon the defense made by Brannock, and accordingly we notice only those of the instructions asked by plaintiffs, and refused by the court, which referred to the title of the children of Cynthia Elizabeth. They were the following:

'' If the jury believe that, after the death of Sarah Ann Adams, Zachariah Wilson and Jane Collins voluntarily came together and cohabited as husband and wife, and were reputed to be such in the community in which they lived, and continued to live together and bear the relation of husband and wife so long as he lived, then, although it does not appear in evidence that they were formerly [*sic*] married according to the laws of Missouri prescribing

how marriages may be solemnized, yet the fact of this voluntary cohabiting as husband and wife, and being so recognized and reputed in the community in which they lived, affords presumptive evidence of marriage, and the jury may infer marriage between them from these facts.

"If Zachariah Wilson had a bastard child born of Jane Collins, and if he afterwards intermarried with Jane Collins and treated his bastard child as his own, then this child was legitimated; and if the jury further find that this was an only child, then such child was his heir, and inherited such land as he died seized of."

The instruction immediately following that last stated declared the invalidity of the alleged marriage, in 1819, between Wilson and Jane Collins, unless certain facts, to the existence of which the bill of exceptions gives no support, were shown to the satisfaction of the jury. The refusal of this instruction could not have prejudiced the plaintiffs.

It will be seen that the learned judge who tried the cause charged very favorably for the plaintiffs on the question of the title of the plaintiffs—quite as favorably as the plaintiffs themselves claimed; more so, we think, than the law warranted. As the judgment was for the defendant, and he has taken no exceptions to the action of the court below, such errors, if existing, are not ground for a reversal. On the subject of the statute of limitation we think, however, that the circuit court erred, and to the prejudice of the plaintiffs.

In fact, this charge, though admirably clear and worthy of imitation, as putting the jury in possession without ambiguity of the views of the law entertained by the court, is liable to criticism in several particulars. It states as *law* matters in respect of which indeed there was no serious contest, but which are matters of fact, nevertheless. Except by consent of parties, or unless they are estopped by the record to deny it, a court is not at liberty to tell the jury that the land in controversy is part of a certain confirma-

tion, or that the title to the land sued for was, at any time, vested in a particular person. We do not find this estoppel or this consent in this transcript; but this is an error committed in favor of plaintiff. On the subject of limitations and adverse possession, we think the court committed serious error. In the first place it tells the jury the effect of "adverse possession" on the title of the documentary owner, without defining the meaning of the phrase; without telling them when, and under what circumstances, "possession" becomes "adverse." Yet it is well known to the profession that few definitions have been the subject of more repeated and more careful judicial inquiry than this of "adverse possession." From the time of the decision of *Taylor* v. *Horde*, 1 Burrow, 60–125, down to the present day, there have been numerous examinations of the really very subtle distinctions between "possession" and "adverse possession." The line of demarkation between "permissive possession" and "adverse possession" may be plain enough, but in the case of *Chouquette* v. *Barada*, tried and determined three times in the Supreme Court of Missouri (23 Mo. 331; 28 Mo. 491; 33 Mo. 249), in the cases of *Dowdall* v. *Byrne*, Batty, 373; *Cook* v. *Nicholas*, 2 Watts & S. 27; *Faixclaim* v. *Shackleton*, 5 Burr. 2604; *Warfield* v. *Lindell*, 30 Mo. 282; *Lapeyre* v. *Paul*, 47 Mo. 586, and numerous others, the question whether a possession was adverse or not, and what were the essential characteristics of an "adverse possession," was the principal inquiry which engrossed the attention of court and counsel.

Passing from this point, however, and assuming that the jury were familiar with distinctions respecting which, at any rate, able counsel have, down to a very recent time, differed in opinion, we come to this passage in the charge:

"But, on the other hand, if you believe from the evidence that, at the time when the suit was brought, more than three years had elapsed from the death of said Cynthia, and that the defendant, and those under whom he holds,

either through themselves or by their tenants, had been in possession of the premises sued for during a period of ten years or more next before such suit, and that such possession was adverse to all others, open, notorious, continuous, and under claim of title, then the plaintiffs cannot recover, and you will find for the defendant."

Now, the undisputed fact was that Cynthia had been married in 1836, and that she died, in July, 1869, a married woman. The defendant went into possession in 1844, at the earliest, but the survey of the confirmation of 1836 was not approved until June 11, 1841. Until then the confirmees had no right of action, and, consequently, until then no presumption could be set up against them. At that time Cynthia was under disability, and, until the act of 1847, the existence of this disability prevented the running of the statute. Under the act of February 2, 1847 (Session Acts, p. 94, and following), limitations, for the first time in our State, ran against a person who was under such disability when the cause of action first accrued. Under that act the bar became complete against such a person in twenty-four years. It follows that, until 1871, at earliest, there could have been against Cynthia Elizabeth, had she survived, no bar arising from an adverse possession of her land; and, as against those claiming under her, if she and her husband had both died the same day, no period short of twenty-four years would have sufficed to complete the bar unless, at least ten years having passed during the continuance of the disability, three years in addition had elapsed after its removal. Hence no possession short of one having a commencement in 1859, and having endured up to the death of Cynthia, and then supplemented by three years of failure to sue on the part of those to whom her title descended, could have created the bar of the statute. But it is quite consistent with the instruction of the court that an adverse possession, taken on August 10, 1862, and continued up to the bringing of this suit, would bar the right

of action of the heirs of the party having the documentary title, though she had been, in 1862, a married woman, and died a married woman, in July, 1869. We think the true construction of the act of 1847 (and our present statute is couched in the same terms) is that if the owner of the land is, when it is first occupied by an adverse holder, under any of the disabilities enumerated in the act, the period during which the disability continues—though more than ten, if less than twenty-four, years—shall not constitute a bar to his or her action, and he or she may, within three years after the removal of the disability, maintain an action for its possession. If, however, the disability continues for twenty-four years, and during all that time an action is forborne, the bar will be complete. The words of the act are: "Such person may bring such suit or action, or make such entry, after the time so limited, and within three years after such disability is removed." What is "the time so limited?" Clearly it is the period of ten years named in the preceding section. The action may be brought after the expiration of this period and *before* the end of (within) three years following the removal of the disability. The language employed by the draftsman is not very well chosen, but we think it yields its meaning to a little careful examination. We will not dwell on the argument in favor of the construction we suggest. To us it seems very plain; we think the rule laid down by the Circuit Court is erroneous; that the error would ordinarily have operated to the prejudice of the plaintiff, and made it our duty to reverse the judgment for the defendant, except that we consider it manifest from the transcript that no conceivable instructions on the subject of limitations, and not even the exclusion of all the evidence offered by defendant on the subject of adverse possession, could warrant a judgment for the plaintiff.

2. We are of the opinion that plaintiffs proved affirmatively that they have no title. They claim as the heirs of

Wilson. Now, they may be his heirs, and he may never have been seized of this land; or he may have been seized of it, and they may fail to show that they are his heirs. It so happens in this case that every circumstance tending to prove one of these propositions at the same time disproves the other. He can only have been seized of the land by virtue of being lawfully married to Sally Adams, and inheriting to her child, for, waiving all other objections, if he had another wife living in 1824, when he married Sally Adams, his marriage with her is bigamous, and our very indulgent statute, which in many instances benignantly refuses to inflict upon the innocent child the penalties due to the transgression of the parents, excepts the case where a prior marriage existed at the time the second was solemnized. Moreover, it is one thing to admit the innocent child in any case to the privileges of legitimacy, and quite another to permit the guilty author of the wrong to take any advantage resulting from his own misdeeds. We should, therefore, have great difficulty in admitting that Wilson had died seized of this land; but the difficulty in considering that the plaintiffs are his heirs is absolutely insuperable.

Marriage, so far as it is a contract at all, is a civil contract under our laws; but we agree with many thoughtful and learned men in thinking that much confusion of idea and laxity of reasoning have arisen from speaking of it as a contract at all. It is an instance of the misleading nature of a *half truth*. The half of a subject is taken and considered as if it were the whole; and conclusions are drawn from the first, without regard to the modifying influence of the second, half. If marriage be a civil contract, and nothing more, why do not all the incidents of other civil contracts attach to it? Why cannot the immediate parties, who, according to this theory, are the *only* parties, dissolve it at pleasure? If *their* consent, and nothing more, were necessary to make it, why cannot the same force unmake it? The legal maxim "*Eodum modo quo quid constituitur, eodem*

*modo dissolvitur*" is supposed to be of universal application. If it fails in respect of the contract of marriage, it is very strange that the incongruity has received no attention from writers on jurisprudence.

The plain truth is that it does *not* fail in respect of this important subject. Marriage is *not* established by the mere pleasure and consent of the two parties most immediately concerned. These two alone may, by their mere consent, effect concubinage, which is a very different thing from marriage, and these two alone can also put an end to this unlawful connection whenever they come under the influence of a returning sense of propriety. But marriage is a condition in which the two parties whose consent is indispensable, *with the consent of the State*, whose concurrence also is indispensable, proceed to take upon themselves obligations of a solemn and indissoluble character. It is true that provision is made for the exceptional discharge of the parties from their vows, but only under circumstances which demonstrate that they were never rightfully made, or when the faithlessness of one of them leaves no room to doubt that the object of the institution will be promoted by dissolving the engagement. Even this is not all. Let these facts be capable of ever so complete proof, the State does not permit the immediate parties to declare them, and to deduce the result of dissolution. It requires the inquiry into their existence to be conducted in a public manner, and with all the safeguards which foresight has provided for the prevention of collusion; and only upon terms ascertained by the statute, which is the voice of the State, can the courts, which are its ministers, proceed to put an end to a condition which was originally designed to be co-extensive with the joint lives of the immediate parties.

We have said that the consent of these immediate parties is indispensable to constitute marriage; to argue from this imperfect premiss that *nothing else* is indispensable would be indifferent logic. The State, by whose ordinances, so

far as our conclusions reach, or are intended to reach, the institution exists, has something to say here. , It does not permit *all* persons who are merely willing to do so to contract marriage. It defines and enumerates certain disabilities, and declares that where these exist the forms of marriage will not avail to render the union legal, or to clothe the man and woman who conform to the solemnities of the statute with the character and qualities of husband and wife. But, on the other hand, such man and woman, though ever so willing and consenting, and though free from all legal disabilities, are required to signify, in some authentic and undeniable manner, their intention to become husband and wife.

It is of vital importance to society that no doubt should rest on the existence of a marriage, and the State declares that certain ceremonies, the preservation of the evidence of which is easy and natural, are essential to that existence. These are placed within the reach of all who in good faith desire their aid. To neglect their observance is to make proclamation of the want of good faith. From the earliest times it has been the mandate of the law in Missouri that marriage must be solemnized in one of several defined modes. Every indulgence has always been given to the views of those who regard it as a sacrament, deriving its sanctity from religious observances, or to the sentiments of those who, not regarding it as a sacrament, yet associate it with religious rites, and prefer its solemnization by ministers of their own creed. The law expressly adopts the forms cherished by any sect of religion, and its ministers are authorized to give a legal sanction to their ritual ceremonies. But provision is also made for that class who are careless of such considerations ; and officials wholly unconnected with any church are, in addition to priests of all denominations, indicated as competent to receive the acknowledgment and grant the certificate which constitutes legal marriage, and furnishes the evidence of it, which the

law requires. To legislation of this nature emphatically applies that canon of construction, " *expressio unius est exclusio alterius.*" The law which prescribes the requisites to a legal marriage necessarily declares that, where these are wanting, no legal marriage exists. It may, of course, happen that, though all these requisites have been actually complied with, the best evidence of them may be swept away. We can conceive of a case where, immediately after such compliance, the record of it and all the witnesses, except the immediate parties, may perish, or such a destruction may occur after an interval of time. In the first case it would be inexcusable, and almost incredible, negligence to omit a repetition of the ceremony. In the second case the conduct of the parties, their living together and treating each other as man and wife, and their acceptance as such by their friends and society, furnish presumptive evidence of the performance of all those conditions, the observance of all those forms, which are prescribed by law to render such conduct lawful. Still, this is only presumptive evidence ; it *tends* more or less strongly to establish a certain conclusion, but, if any direct evidence on the point exists, the value of the presumptive evidence ceases altogether. The direct evidence shows that the conclusion is true or untrue. In the first case the presumptive and secondary evidence is superseded by evidence of a higher nature ; in the second it is completely overthrown.

The language of Mr. Justice Story—not in the text of his celebrated treatise on the Conflict of Laws, but in the *note*, in which he expresses without reserve his own views on this interesting subject—appears to us worthy of special approval (note to sec. 108) : " I have, throughout, treated marriage as a contract in the common sense of the word, because this is the light in which it is ordinarily viewed by jurists, domestic as well as foreign. But it appears to me to be something more than a mere contract. It is rather to be deemed an institution of society, founded upon the consent

and contract of the [immediate] parties, and in this view it has some peculiarities in its nature, character, operation, and extent of obligation different from what belongs to ordinary contracts.''

We have taken the liberty to interpolate a word for the sake of emphasizing a distinction which, we think, was clearly in the mind of the accomplished author of the passage we have cited; and, with the definition thus interpreted, we express our entire concurrence.

Marriage is '' an institution of society ;'' the State is a party to the bargain which a man and woman make when they become husband and wife. Therefore, only in such modes as the State has prescribed can the condition of marriage be established, and only in such modes and for such reasons as the State has declared beforehand, or such as by the exercise of its inherent power it may thereafter prescribe, can the obligations of marriage be dissolved. The parties most immediately concerned are powerless to do this. This is so emphatically true that in a divorce case few things rouse the vigilance and criticism of a court of justice more than any appearance of mutual consent to a separation. But it was not at one time so clearly perceived that the third party, the State, acting through its legislative department, was equally powerless. This, however, is settled law in Missouri. *Gentry* v. *Fry*, 4 Mo. 120 ; *Bryson* v. *Campbell*, 12 Mo. 498 ; *Bryson* v. *Bryson*, 17 Mo. 590. It is otherwise, of course, in those governments where, as in Great Britain, the Parliament is supreme, unfettered by limitations of any kind except such as are imposed by the nature of matter, and speaks and acts with all the power and authority residing in the three estates of the realm.

If it be now replied that in a certain sense the State is a party to every contract, and that marriage does not cease to come within that description because the State is a party to it, the rejoinder is that it is enough for the present argument if the State is admitted to be a necessary party to

the *contract of marriage.* This being conceded, we draw the necessary inferences, and are not careful about terms. For, if the State be a necessary party, it of course intervenes only on its own conditions and in its own modes. If these do not have place, the State is no party, and there is no marriage.

There was no compliance, in 1819, by Zachariah Wilson and Jane Collins, with the requirements of the law. They did not contract marriage, nor attempt to contract it. They merely made arrangements for concubinage, and we see by the light of the conduct of one at least of the parties to this arrangement, what his intentions were. After three weeks of illicit intercourse he left his companion, and for more than ten years, during which he formally married another woman, he and Jane Collins were strangers, and sustained to each other no legal or actual relation. Whether Wilson practiced any deception on Jane Collins in 1819 is nothing to the purpose. We see no evidence of such deception, however; she appears to have known perfectly well that she was forming with him a degrading and immoral connection, and that she then and afterwards deliberately accepted the consequences of it. It should be added that she acted, if unchastely, yet bravely, consistently, and truthfully. But, had she been ever so much wronged and deceived, it would not have affected this question. We are inquiring whether she and Wilson were married in 1819, and it is not only manifest that they were not, but that neither of them supposed that they were.

3. Was anything done after the death of Sally Adams to legitimize the fruit of this concubinage? The answer is, nothing. Of course, nothing short of compliance with the law will secure a consequence which is promised only as a reward of such compliance; and, hence, it is necessary to note what the law requires.

The act of the General Assembly which was in force in 1830, and has continued in force ever since, was approved

February 11, 1822, and is to be found on page 328, section 8, of the Revised Code of 1825. It is in these words:

" When a man, having by a woman one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him as his, shall be thereby legitimated," etc.

It is well known to the profession that this enactment is borrowed from the civil law, and is the same provision which was repudiated in the memorable language of our English ancestors at the Parliament of Merton. It defines the conditions on which bastards may be legitimated, in very unambiguous terms. If Zachariah Wilson, having a bastard child by Jane Collins, had afterwards intermarried with her, and acknowledged the child as his, the statute would have been complied with. But, from the lips of Jane Collins, we have the assurance that no such marriage ever took place, and that is the end of the matter. It is idle to talk of presumptive evidence when we can appeal to direct testimony; idle to speculate as to the more or less plausible nature of the probability afforded by subsequent cohabitation, repute, etc., in the absence of direct and primary evidence. The conclusive answer to suggestions of this kind is that the direct, primary, and unanswerable evidence is *not* absent. It is here, and it is conclusive. Jane Collins, called in this record Jane Wilson, was examined by the plaintiff. She spoke with every appearance of truth and candor, and gave no sort of support to a theory which she must have known that her grandchildren were interested in upholding; on the contrary, she demolished it completely.

This is decisive of the controversy. If Cynthia Elizabeth could not show herself to be the heir of Zachariah Wilson, of course her children cannot, and the case is at an end. All this appeared by the testimony of the plaintiffs, and the defendant should not have been called on to vindicate his possession.

With the concurrence of all the judges, the judgment is affirmed.